J-A23012-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| J.L.B. AND S.B., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| J.B., | : | |
| | : | |
| v. | : | |
| | : | |
| E.K., | : | No. 2032 WDA 2013 |

Appeal from the Order entered November 26, 2013,
Court of Common Pleas, Beaver County,
Civil Division at No. 11039 of 2012

---

| | | |
|---|---|---|
| J.L.B. AND S.J.B., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| J.B. AND E.K., | : | |
| | : | |
| APPEAL OF: E.K. | : | No. 14 WDA 2014 |

Appeal from the Order November 26, 2013,
Court of Common Pleas, Beaver County,
Civil Division at No. 11039 of 2012

BEFORE:  DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:          **FILED SEPTEMBER 09, 2014**

J.L.B. ("Grandfather") and S.J.B. ("Step-Grandmother") (collectively, "Grandparents") appeal from the order of court awarding primary physical and legal custody of L.B. ("Child") to E.K. ("Father").  Father has filed a cross-appeal, challenging the trial court's determination that Grandparents have standing to seek custody of Child.  For the reasons discussed herein,

we reverse the trial court's determination that Grandparents have standing to pursue custody of Child and vacate the November 26, 2013 order granting them partial custody.

The relevant background in this case, which is lengthy and abysmal, is as follows. J.B. ("Mother") was living in Florida when she became pregnant with Child.[1] Mother and Father, who never married, have an historically difficult and allegedly abusive relationship. When Mother was approximately four months pregnant, she moved into Grandparents' home in Beaver County. Between the time Mother moved in with Grandparents and gave birth to Child, she was in contact with Father via email. Father asked Mother whether he could attend Child's birth, but Mother refused this request based on Father's rancorous relationship with Grandfather. Following Child's birth in late 2011, Mother and Child resided in Grandparents' home for the first two months of Child's life. Mother and Child then moved into the home of Mother's brother and his family. During this time, Step-Grandmother would watch Child during the day while Mother worked.

The spring after Child's birth, Grandparents suggested that Mother visit her other child in Florida and offered to pay for her to travel there at the end of May. However, on May 16, 2012, Mother's brother kicked her out of his home, having her removed from his house by the police.

---

[1] Mother moved to Florida as a teenager. Mother and Father are the parents to another, older child. Father and Mother's biological mother, who also lives in Florida, share custody of that child.

Grandparents refused to allow Mother and Child stay in their home and instead bought Mother a one-way bus ticket to Florida. Mother left Child with Grandparents and went to Florida. While she was gone, Mother called Step-Grandmother multiple times a day to check on Child. Step-Grandmother stopped answering Mother's calls after the first week.

On May 31, 2012, while Mother was out of state, Grandparents filed a complaint for custody and a petition for emergency relief seeking temporary physical and legal custody of Child. On the same day, the trial court granted Grandparents' petition. The only attempt Grandparents made to serve Mother with these documents was mailing them to the brother's house, where they knew Mother was not living.[2] Grandparents made no attempt to serve Father with the custody complaint at all, as they contend that they did not know he was Child's father at that time.

On or about June 5, 2012, Mother and Father returned to Pennsylvania. They went to Grandparents' house to retrieve Child. Fearing that there would be problems, Mother arrived with the local police.[3] Step-Grandmother refused to give Child to Mother, and for the first time, provided

---

[2] Grandparents claim that they could not serve Mother in Florida because they did not know where Mother was residing. However, they admit that they had telephone contact with Mother during this time. N.T., 9/12/12, at 55. Their assertion that they could not know where Mother was located is utterly unsupported by the record.

[3] In acknowledgment of his strained relationship with Grandfather, Father did not approach the house but remained in a location down the road while Mother attempted to obtain Child.

her with the emergency custody order. Mother and Father returned to Florida without Child.

On June 22, 2012, Father filed a motion to join Grandparents' custody action as an additional defendant and included a counterclaim for primary legal and physical custody of Child. He also filed preliminary objections to Grandparents' complaint, arguing that it must be dismissed because, *inter alia*, they lacked standing to seek custody of Child. The trial court joined Father as an additional defendant and, following a hearing, determined that Grandparents stood *in loco parentis* to Child and therefore that they could pursue custody pursuant to 23 Pa.C.S.A. § 5324. Subsequently, on November 26, 2013, at the conclusion of a two-day custody trial, the trial court awarded Father primary physical and legal custody of Child. The trial court designed the transfer of custody such that the Child would spend increasingly longer periods with Father over a period of approximately six months, in order to ease the transition on Child, with the transfer of custody being complete by May 23, 2014. Grandparents were awarded partial custody of Child in the form of one weekend per month with additional time over some holidays and the summer. *See* Trial Court Order, 11/26/13.

The parties subsequently filed the present appeal and cross-appeal. We begin by acknowledging our scope and standard of review:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court

that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***J.R.M. v. J.E.A.***, 33 A.3d 647, 650 (Pa. Super. 2011).

Because it is dispositive, we begin with the issue raised by Father in his cross appeal. Father argues that the trial court erred in determining that Grandparents had standing to seek custody of Child. Appellant's Brief at 12.

The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of. The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter. Thus the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand. Moreover[,] [i]n the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

***D.G. v. D.B***., 91 A.3d 706, 708 (Pa. Super. 2014) (citations omitted).

Section 5324 of the Custody Act governs who may pursue custody of a child.

It provides as follows:

> The following individuals may file an action under this chapter for any form of physical custody or legal custody:
>
> (1) A parent of the child.
>
> (2) A person who stands *in loco parentis* to the child.
>
> (3) A grandparent of the child who is not *in loco parentis* to the child:
>
>> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;
>>
>> (ii) who assumes or is willing to assume responsibility for the child; and
>>
>> (iii) when one of the following conditions is met:
>>
>>> (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);
>>>
>>> (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or
>>>
>>> (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324. It must be recognized, however, that "standing established by virtue of *in loco parentis* status does not elevate a third party to parity with a natural parent in determining the merits of custody dispute." ***Jacob v. Shultz-Jacob***, 923 A.2d 473, 477 (Pa. Super. 2007). Rather,

> the natural parent has a *prima facie* right to custody, which will be forfeited only if clear and convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard to the biological parents' side.

***J.F. v. D.B.***, 897 A.2d 1261, 1273 (Pa. Super. 2006)(citation omitted).

In the present case, the trial court found that Grandparents attained *in loco parentis* status when Mother left Child with them and went to Florida in May 2012. Trial Court Opinion, 1/30/14, at 4-6. "The status of '*in loco parentis*' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child." ***D.G.***, 91 A.3d at 708-09 (citation omitted). However, it is well established that "a third party … cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship." ***Id.*** at 709. Furthermore,

> [t]he requirement of a natural parent's participation and acquiescence is critical to the determination of whether to accord a third party *in loco parentis* status. ***See McDonel v. Sohn***, 762 A.2d [1101,] 1106 (Pa. Super. 2000)] (recognizing that there can

> be no *in loco parentis* status for a third party if the natural parent's actions conflict with such a finding). The law simply cannot permit a third party to act contrary to the natural parent's wishes in obtaining custody and then benefit from that defiant conduct in a subsequent custody action.

*J.F.* at 1275-76. Quite simply, a third party may not assume *in loco parentis* status when either natural parent opposes it. *Id.* at 1274 (citing *B.A. v. E.E.*, 741 A.2d 1227, 1229 (Pa. 1999)).[4]

We find *J.F.* instructive to the situation we face in the present case. *J.F.* involved a gestational carrier who was not biologically related to the triplets she carried for the father, J.F., and his wife.[5] Shortly after giving birth to the triplets, the gestational carrier decided that J.F. and his wife would not be fit parents and so she absconded from the hospital with the babies and refused to return them to J.F. As soon as J.F. learned that this had occurred, he filed a complaint for custody, naming the carrier as the defendant. When the gestational carrier responded by filing a counter-claim for custody, Father challenged her standing. The trial court found that the gestational carrier stood *in loco parentis* to the children, but this Court disagreed. We hewed to the well-settled principle that "that there can be no

---

[4] As Justice Nigro eloquently stated in his concurring opinion in *B.A.*, "The stakes are simply too high and the rights of the non-consenting parent too substantial to allow one parent to confer *in loco parentis* status on a third party." *B.A.*, 741 A.2d at 1229 (Nigro, J. concurring).

[5] J.F.'s wife was not biologically related to the triplets, as they were conceived *in vitro* with J.F.'s sperm and ovum from an egg donor.

finding of *in loco parentis status* where the third party obtains her status in defiance of the natural parent's wishes" and determined that the trial court erred in concluding that the gestational carrier had *in loco parentis* status. ***Id.*** at 1276. Of importance, we note that J.F. made his opposition to the gestational carrier's relationship with the children known immediately upon becoming aware that she had taken them home with her and refused to return them to him.

Similarly, it is without question that Father has opposed Grandparents' assumption of parental duties for Child and their attempt to obtain custody of Child from the moment he learned of their efforts. As noted above, the trial court determined that Grandparents assumed all parental duties for Child when Mother left him in their care and went to Florida. Trial Court Opinion, 1/30/14, at 4-6. The trial court discredited Mother's testimony that she intended to return to Pennsylvania, and that is a determination that this Court cannot disturb. ***See Busse v. Busse***, 921 A.2d 1248, 1256 (Pa. Super. 2007) (holding that this Court "do[es] not reverse credibility determinations on appeal."). However, this does not account for the fact that Father has never consented to Grandparents' assertion of *in loco parentis* status. The record does not reveal when, precisely, Father became aware that Mother left Child in Grandparents' care, but it clear that within approximately two weeks, Father attempted to take Child home with him and out of Grandparents' care. When Grandparents refused to return Child

to him, Father promptly sought to be joined in this matter, sought primary custody of Child and challenged Grandparents' standing. From these actions, it is eminently clear that Father did not consent to Grandparents' assumption of parental duties for Child; therefore, they could not have attained *in loco parentis* status. As such, the trial court erred as a matter of law in its conclusion otherwise.

The trial court finds that Father gave "implied consent" to Grandparents' *in loco parentis* status because he "did nothing to exercise his parental rights for the first five and one-half months of [Child's] life." Trial Court Opinion, 1/30/14, at 3. This reasoning is flawed, as Father's failure to fulfill parental duties for the first five months' of Child life, while Child was in Mother's custody in a distant state, is irrelevant to whether he consents to a third party assuming parental duties for Child. Moreover, given the very young age of Child, the distance between Father and Mother's residences, and the fact that Father and Grandfather – with whom Mother and Child were living for the first months of Child's life – had such a horrendous relationship that Father could not be present for the birth of Child, Father's failure to have acted sooner to become involved in Child's life cannot trump his status as Child's biological parent, who has a *prima facie* right to custody. **See J.F.**, 891 A.2d at 1273. As stated multiple times above, when a biological parent does not consent, a third party cannot obtain *in loco parentis* status. Father made his opposition to Grandparents' attempts to

assume *in loco parentis* status known, if in no other way, by the filing of his claim for primary custody and preliminary objections challenging their standing. Father filed these documents just over one month after Mother left Child with Grandparents (which the trial court has determined to be the date Grandparents assumed *in loco parentis status*) and approximately two weeks after finding out that Grandparents were attempting to obtain custody of his son. We find this to be prompt and unequivocal refusal of consent to Grandparents obtaining *in loco parentis* status. Any delay in action should not be charged against Father, as Grandparents made no effort to serve him with their custody complaint, intentionally keeping him in the dark as to their maneuverings. In the context of the facts of this case, it was error for the trial court to rely on what it viewed as "implied consent" when Father, at the first opportunity, immediately voiced his objection to Grandparents' *in loco parentis* status.

We note that in response to Father's preliminary objections, Grandparents asserted not only that they stood *in loco parentis*, but also that they had standing by virtue of Section 5324(3). Brief in Opposition to Additional Defendant's Preliminary Objections, 7/31/12, at 6-7. Although set forth above, we reiterate that this subsection provides that a grandparent who does not stand *in loco parentis* may have standing to pursue custody if the "relationship with the child began either with the consent of a parent of the child or under a court order;" the grandparent

"assumes or is willing to assume responsibility for the child" and one of the following conditions is met:

> (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);
>
> (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or
>
> (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324(3).

The trial court did not address this provision in its opinion, but our review of the record reveals that Grandparents have failed to establish that they satisfy its criteria. While there is evidence to support findings that Grandparents' relationship with Child started with Mother's consent and that they are willing to assume responsibility for Child, there is no evidence of record that Child has been declared dependent; that Child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse, or incapacity;[6] or

---

[6] There was testimony providing that Mother and Father have had a physically abusive relationship, but no evidence of abuse of Child or any other child by Mother or Father. Both Mother and Father denied drug or alcohol abuse and submitted to drug tests during the course of these proceedings. Both were found to be clean of illegal substances. Mother

that Child resided with Grandparents for 12 consecutive months before being removed by a parent. Grandparents could not successfully assert standing under this subsection.

In conclusion, the trial court erred in concluding that Grandparents had standing pursuant to § 5324. Because Grandparents did not have standing, we do not reach the issues raised in their appeal, which challenge the trial court's failure to award them primary custody of Child. ***See J.F.***, 897 A.2d at 1273 (holding that upon conclusion that gestational carrier had no standing to pursue custody, sole custody would vest in biological parent and this Court need not reach challenge to trial court's award of custody). Accordingly, we reverse the trial court's determination that Grandparents have standing to pursue custody of Child and vacate the November 26, 2013 order granting them partial custody.

Order vacated. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2014

---

admits that she is on medication for mental health issues, and this was the only drug found in her drug screen.