J-S01020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FRANCIS COLLIN VETTER | : | |
| | : | |
| Appellant | : | No. 607 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 21, 2021
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0001774-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FRANCIS COLLIN VETTER | : | |
| | : | |
| Appellant | : | No. 608 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 21, 2021
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0000440-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FRANCIS COLLIN VETTER | : | |
| | : | |
| Appellant | : | No. 609 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 21, 2021
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0001772-2019

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                   :            PENNSYLVANIA
                                   :
            v.                         :
                                   :
                                   :
FRANCIS COLLIN VETTER         : 
                                   :
          Appellant         :    No. 610 MDA 2024

Appeal from the Judgment of Sentence Entered October 21, 2021
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0001055-2019

BEFORE: NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:           **FILED: APRIL 24, 2025**

Appellant, Francis Collin Vetter, appeals *nunc pro tunc* from the judgment of sentence entered in the Lackawanna County Court of Common Pleas, following his jury trial convictions for four counts of rape of a child, six counts of indecent assault, two counts of obstruction in child abuse cases, and related offenses.[1] We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them. (**See** Trial Court Opinion, filed 6/20/24, at 1-12). Procedurally, we add that this Court consolidated the appeals *sua sponte* on July 9, 2024.

Appellant raises the following issues for our review:

> Whether there was insufficient evidence to convict Appellant of intimidation, retaliation or obstruction of child abuse

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(c), 3126(a), and 4958(a)(1), respectively.

- 2 -

cases under [18 Pa.C.S.A.] § 4958(a)(1) [when the Commonwealth] failed to establish the elements necessary for conviction, particular conduct which violated the statute, or intent?

Whether the trial court abused its discretion by considering only the nature and gravity of the offense, and not giving proper consideration to Appellant's age, lack of criminal record, and rehabilitative needs, which violated sentencing guidelines and resulted in a manifestly unreasonable and excessive sentence?

Whether the trial court abused its discretion in imposing consecutive sentences for all counts since it resulted in an unduly harsh and excessive sentence as it amounts to a *de facto* life sentence?

Whether the trial court imposed an illegal sentence when it failed to merge for sentencing indecent assault in Count 26 through Count 29 with rape of a child in Count 1 through Count 4?

(Appellant's Brief at 4) (reordered for purposes of disposition).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Andrew J. Jarbola, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion at 13-15, 19-27) (finding: **(issue 1)** sufficient evidence supported Appellant's obstruction convictions because Commonwealth introduced evidence that Appellant texted/called his girlfriend's daughter and asked her to try to get both victims, S.B. and G.V., to say that they made up allegations against Appellant and to record their

statements; **(issues 2-3)**[2] court reviewed pre-sentence investigation report, which contained details of Appellant's background, and considered Appellant's rehabilitative needs by ordering Appellant to attend sexual offender counseling; court properly considered all sentencing factors and ultimately concluded that gravity of Appellant's offenses, committed against his own children for extended period of time, and need to protect other children from similar harm, warranted consecutive sentences that resulted in lengthy

_____

[2] In his second and third issues, Appellant raises challenges to the discretionary aspects of his sentence. "[C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right." ***Commonwealth v. Perzel***, 291 A.3d 38, 46 (Pa.Super. 2023), *appeal denied*, ___ Pa. ___, 301 A.3d 426 (2023). Prior to reaching the merits of a discretionary sentencing issue:

> [W]e conduct a four part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted).

Here, Appellant raised his sentencing issues in a timely post-sentence motion, filed a timely notice of appeal, and included in his appellate brief a Rule 2119(f) statement. Further, Appellant's claims arguably raise a substantial question for our review. ***See Commonwealth v. Caldwell***, 117 A.3d 763, 768 (Pa.Super. 2015) (*en banc*), *appeal denied*, 633 Pa. 774, 126 A.3d 1282 (2015) (holding that appellant's challenge to imposition of consecutive sentences as unduly excessive, together with claim that court failed to consider rehabilitative needs upon fashioning sentence, presents substantial question.) As such, we address the merits of Appellant's sentencing issue.

aggregate sentence; **(issue 4)** Commonwealth charged Appellant with six counts of indecent assault on grounds that Appellant forced S.B. to engage in oral sex and other indecent contact on regular basis from age seven to twelve; criminal acts that supported indecent assault counts were different from criminal acts of sexual intercourse that supported rape counts; as such, convictions do not merge for purpose of sentencing).  Accordingly, we affirm on the basis of the trial court's opinion.[3]

Judgment of sentence affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/24/2025

_____

[3] We direct the parties to attach a copy of the trial court's opinion to any future filings involving this appeal.

MAURI B. KELLY
LACKAWANNA COUNTY

2024 JUN 20 A 11: 34

CLERKS OF JUDICIAL
RECORDS CRIMINAL
DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE COURT OF COMMON PLEAS |
| | :      OF LACKAWANNA COUNTY |
| | : |
| vs. | :     CRIMINAL ACTION |
| | : |
| FRANCIS VETTER, | : |
| Defendant | :   NOS. 19-CR-440, 1055, 1772 & 1774 |

## OPINION

### JARBOLA, J.

On June 18, 2021, following a jury trial, Defendant Francis Vetter was convicted of four counts of rape of a child, four counts of statutory sexual assault, six counts of involuntary deviate sexual intercourse with a child, four counts of aggravated indecent assault of a child, four counts of incest with a minor under the age of 13 years, four counts of corruption of minors, six counts of indecent assault of a person less than 13 years of age, one count of endangering the welfare of a child, and two counts of obstruction of a child abuse investigation. On October 21, 2021, this court sentenced the defendant to an aggregate sentence of 136 to 370 years, followed by 74 years of special probation.

On February 18, 2022, the defendant filed a Notice of Appeal. On June 9, 2022, the Superior Court quashed the appeal because it was untimely.

On March 8, 2023, the defendant, through counsel, filed a Petition for Post Conviction Collateral Relief, seeking reinstatement of his appellate rights nunc pro tunc. On January 23, 2024, the defendant filed an Amended PCRA Petition. On February 29,

2024, this court granted the PCRA petition and reinstated the defendant's right to file post-sentence motions and right to appeal nunc pro tunc. On March 11, 2024, the defendant filed Post-Sentence Motions, and on April 1, 2024, the motions were denied.

On April 26, 2024, the defendant filed a Notice of Appeal of the judgment of sentence to the Superior Court. This opinion is filed in compliance with Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## I. BACKGROUND

The actions leading to the charges in this case began in March of 2013, when the defendant, who had custody of his seven-year-old daughter, S.B., started a systematic pattern of sexually assaulting her. The defendant showed her pornographic videos (specifically father/daughter pornography) on his cell phone, and told her to do what they were doing. When S.B. was seven, eight and nine years old, she performed oral sex on her father approximately once a month in his bedroom, in her bedroom, in the living room and in her father's car. Also during this time, the defendant had S.B. touch his penis with her hands, and told her not to tell anyone because he could get into a lot of trouble. When S.B. was nine years old, the sexual relationship escalated, and in addition to engaging in touching and oral sex, the defendant began to have sexual intercourse with his daughter. When S.B. was between the ages of nine and twelve years old, the defendant had sexual intercourse with her in her bedroom, in his bedroom, in the shower, in the living room, in the dining room and in the laundry room. This occurred once or twice a month. Finally, in December of 2018, when S.B. was twelve years old, the defendant once again initiated sexual intercourse with her, but she pushed herself away from him. The defendant then put his hand on her throat and choked her, scaring her. When S.B. went to her mother's house for Christmas break, she disclosed the abuse to her half-sister, and on New Years Day 2019, her sister disclosed the abuse to S.B.'s mother. S.B.'s mother immediately brought S.B. to a hospital in Schuylkill County, and

2

the next day, brought her to the Children's Advocacy Center in Scranton where further evaluation and testing for sexually transmitted diseases were performed. S.B. tested positive for Chlamydia which is spread only through vaginal, anal or oral sex. The police then brought the defendant to the hospital for testing, and he also tested positive for Chlamydia.

The defendant also has a minor son, G.V., who is one year younger than S.B. and is her half-brother. When G.V. was eleven, the defendant took G.V.'s cell phone from him and pulled up pornography videos (specifically brother/sister pornography) and made G.V. watch the videos. He told G.V. that he should masturbate and do what he saw on the videos with his sister. The defendant did this about four or five times.

After these allegations came to light, on February 6, 2019, and again on March 8, 2019, the defendant contacted his current girlfriend's minor daughter, who was friends with S.B., and asked her to attempt to get S.B. to say that she made up the allegations about the sexual abuse, and to try to record the conversation. Similarly, on March 21, 2019, and March 25, 2019, the defendant again contacted his current girlfriend's minor daughter, and asked her to attempt to get his son G.V. to say that he made up the allegations concerning the defendant encouraging and teaching him to watch pornographic videos and to have sex with his sister.

On June 15, 2021, a jury trial commenced and concluded on June 18, 2021. The jury found the defendant guilty of four counts of rape of a child, four counts of statutory sexual assault, six counts of involuntary deviate sexual intercourse with a child, four counts of aggravated indecent assault of a child, four counts of incest with a minor under the age of 13 years, four counts of corruption of minors, six counts of indecent assault of a person less than 13 years of age, one count of endangering the welfare of a child, and two counts of obstruction of a child abuse investigation. The defendant was acquitted of one count of facilitating incest and two counts of corruption of minors. On October 21,

3

2021, this court sentenced the defendant to an aggregate sentence of 136 to 370 years in prison, followed by 74 years of special probation. On November 9, 2021, the defendant filed a motion for reconsideration of sentence, which was denied on January 24, 2022.

New counsel was appointed and on February 18, 2022, a Notice of Appeal was filed. On June 9, 2022, the Superior Court quashed the appeal because it was untimely. On March 8, 2023, the defendant, through counsel, filed a Petition for Post Conviction Collateral Relief, seeking reinstatement of his appellate rights nunc pro tunc. On August 21, 2023, the Commonwealth filed a response. On September 22, 2023, this court issued a Notice of Intent to Dismiss the PCRA petition because it was untimely. On September 25, 2023, the defendant filed a Response to the Notice, and on October 25, 2023, the Commonwealth filed a Response to the defendant's Response. On January 21, 2024, the defendant filed a Petition to File an Amended PCRA petition, raising exceptions to the one-year filing requirement of the PCRA, and on January 23, 2024, this court granted the petition and the defendant filed an Amended PCRA Petition. On February 15, 2024, the Commonwealth filed a Response. On February 21, 2024, the defendant filed a Response to the Commonwealth's Response. On February 29, 2024, this court granted the PCRA petition and reinstated the defendant's right to file post-sentence motions and right to appeal nunc pro tunc. On March 11, 2024, the defendant filed Post-Sentence Motions, and on April 1, 2024, the motions were denied.

On April 26, 2024, the defendant filed a Notice of Appeal of the judgment of sentence to the Superior Court. On May 1, 2024, this court ordered the defendant to file a concise statement of the matters complained of on appeal within 21 days pursuant to Pa.R.A.P. 1925(b). On May 19, 2024, the defendant filed a Concise Statement of Matters Complained of on Appeal.

4

## II. DISCUSSION

### A. Defendant's Statement

In his statement, the defendant submits ten issues for appeal. The defendant asserts that the jury's verdict was against the weight of the evidence. He also asserts that the evidence was not sufficient to establish every element necessary to convict him of knowing or intending to obstruct a child abuse report or investigation under 18 Pa.C.S.A. § 4958(a)(1). He raises five issues concerning the expert testimony of Commonwealth witnesses Cheryl Friedman and Janine Fortney. Finally, he raises three issues concerning the legality of the sentence imposed.

### B. Analyis

#### 1. Weight of the Evidence

The defendant asserts that the jury's verdict was against the weight of the evidence since the case depended on the testimony of the minor complainant, S.B., who gave contradictory and inconsistent statements, and that even after the defendant was arrested and incarcerated, she voluntarily and repeatedly told others that the defendant never sexually assaulted her and that her mother forced her to say the things she did about the defendant. The defendant also asserts that the minor was examined by the Children's Advocacy Center which found no evidence of any type of sexual assault even though it was alleged that S.B. was having sexual intercourse with the defendant from the age of nine. He asserts that the court should find that the verdict shocks the conscience and one's sense of justice.

##### a. Testimony at Trial

The Commonwealth called eleven witnesses at trial, three of whom offered testimony

5

relevant to the defendant's weight of the evidence claim. S.B. testified that she is currently fifteen years old and that her birthday is March 9, 2006. Transcript of June 16, 2021 Jury Trial at 5. She testified that her mother is Shannen Balas, and her father is the defendant. Id. She testified that she has three younger half-brothers whose mother is Amanda Scatton; a younger half-sister whose mother is Desiree Esposito; and two younger half-sisters and a younger half-brother whose mother is Shannen Balas. Id. at 6-7. She testified that while she currently lives in foster care, from age two to age twelve, she lived in Lackawanna County with the defendant, and also, for part of that time, her stepmother Amanda Scatton and her three half-brothers, and that she would see her mother in Schuylkill County every other weekend, on holidays and during the summer. Id. at 8-10.

She testified that when she was seven years old, her father called her into his room and showed her a video of people having sex on his cell phone and told her to do what they were doing, and she learned later that it was father/daughter porn. Id. at 14-15. She testified that between the ages of seven and nine, he would show her these videos and would make her put his penis in her mouth, and that this happened in his bedroom, in her bedroom, in the living room, and in his car. Id. at 15-16. She testified that she would perform oral sex on the defendant approximately once a month, and that he would ejaculate in her mouth and tell her to spit it out. Id. at 16-17. She testified that he would also have her touch his private areas with her hands, and that he would tell her not to tell anybody because he could get into a lot of trouble. Id. at 17-18. She testified that if she said that she did not want to perform oral sex, her father would promise to give her phone back or to give her money. Id. at 18-19.

6

She testified that when she was nine, the sexual relationship with her father expanded beyond touching his penis with her hands or putting his penis in her mouth to having sexual intercourse. Id. at 20-21. She testified that the first episode occurred in her bedroom after her stepmother Amanda Statton and her half-brothers moved out, but that her father and she also had sexual intercourse in his room, in the shower, in the living room, in the dining room and in the laundry room. Id. at 20-22. She testified that this would happen once or twice a month, starting when she was nine until she was twelve. Id. at 22.

She testified that in December of 2018, they had moved to a new house, and the defendant asked her to help him to get the attic room ready for her brothers, and then he took her to the back of the attic room and asked her to engage in oral sex, which she did, and then to remove her clothes, which she did. Id. at 23. She testified that as she lay on the floor and the defendant got on top of her, she pushed herself away from him. Id. She testified that she kept doing this, until he put his hand on her throat and choked her, and she began to cry. Id. She testified that this scared her. Id. She testified that she then went to her mother's house for Christmas break, and confided to her half-sister what had been going on with her father, and, on New Years Day, her sister told her mother. Id. at 25-26. She testified that her mother immediately confronted her and took her to the hospital where she had some tests, and the next day brought her to the Children's Advocacy Center in Scranton where she was interviewed, and had a full medical exam, including a vaginal exam. Id. at 26-27. She testified that she was diagnosed with Chlamydia. Id. at 27.

She testified that she then began living with her mother, stepfather, stepsister and

7

three half-siblings in Frackville. Id. at 28. She testified that in November of 2019, she moved with them to a new house in Shenandoah, and then in June of 2020, she and her mother and her half-siblings moved to Nanticoke. Id. at 28-29. She testified that in June of 2020, she had a fight with her mother and ran away to live with the defendant's girlfriend, Desiree Esposito, in Moscow. Id. at 29. She testified that she was friends with Desiree's daughter, K.E. who was her age, and that Desiree and her father also had a daughter together who at the time of trial was five years old. Id. at 30. She testified that she liked living with Desiree, and that she talked to her father while she was there. Id. at 32. She testified that Desiree talked to her about the charges against her father and she eventually told Desiree that her father did not sexually assault her, and Desiree then asked her to speak with a man named Joe who was a private investigator. Id. at 32, 43. She testified that Joe had her write a letter to the district attorney stating that her father did not do anything to her, that her mother made her say that her father abused her, and that Trooper Jeremy Carroll scared her and made her feel that she had to continue to lie about her father. Id. at 32-35, 45, 53-57; Commonwealth Exhibit 2 and Defense Exhibit 3. She testified that she told Desiree and Joe that she was never sexually assaulted by her father because she was living in a place where everybody was against her and did not believe her, and it was hard, and they would talk about the defendant and how they couldn't wait for him to come home and what a great dad he was, and it was easier for her to say it didn't happen than to fight against them. Id. at 45-46. She testified that she felt she had to appease Desiree, and that she also wrote a letter to her thanking her for taking her in and buying her things and saying she was sorry about everything. Id. at 68-69; Defense Exhibit 1. She testified that she felt she had to lie about the allegations

8

because she lived with Desiree and had to tell the people around her that it didn't happen because it made her feel comfortable living there because Desiree would call her father and bring her places where people would be on Desiree and her father's side. Id. at 70-71. She testified that when a Children and Youth worker from Luzerne County, Ashley Thomas, came to talk to her at Desiree's house, Desiree was present, so she felt she had to tell the worker that the abuse did not happen. Id. at 72-73. She also testified that after the preliminary hearing on February 20, 2019, she wrote a letter to her mother detailing the abuse that she had endured beginning at age seven. Id. at 106-109; Commonwealth Exhibits 3A and 3B.

The next witness for the Commonwealth was Cheryl Friedman who is a family nurse practitioner and a Sexual Assault Nurse Examiner, who has specialized training, certifications and experience in the field of sexual assaults, and who works at the Children's Advocacy Center in Scranton. Id. at 116-120. Ms. Friedman testified that she has been involved in well over 2000 cases of suspected child abuse and has testified as an expert approximately 22 times. Id. at 120-123. The court admitted Ms. Friedman as an expert in the area of child sexual abuse. Id. at 124. Ms. Friedman testified that on January 2, 2019, she performed a physical examination of S.B., gathered her physical history and performed a genital examination of her. Id. at 130-133. She testified that S.B.'s genital structures were all normal, but that she also collected samples from her vaginal canal to test for sexually transmitted diseases and submitted them to the Moses Taylor Hospital laboratory for testing. Id. at 134-139. She testified that she expected a normal examination in this case because time had passed since the last sexual contact and the genital area heals very quickly without scar tissue. Id. at 141-142. She testified that a

9

normal examination does not mean that sexual abuse has not occurred. Id. She testified that the laboratory eventually reported that S.B. tested positive for Chlamydia, which is only transmitted through vaginal, oral or anal sexual intercourse. Id. at 136, 148.

The Commonwealth also called Corporal Jeremy Carroll of the Pennsylvania State Police and he testified that he became involved in the investigation of this case on January 1, 2019, when the State Police received a call about a child rape that occurred in the area and were told that the victim was being seen at a hospital in Schuylkill County. Transcript of June 17, 2021 Jury Trial at 39. He set up the interview and evaluation of S.B. at the Children's Advocacy Center in Scranton on January 2, 2019. Id. at 41. He testified that he was later notified by the Children's Advocacy Center that S.B. had tested positive for Chlamydia, and that the test results from the hospital in Schuylkill County also yielded a positive Chlamydia test. Id. at 41-42. He testified that he obtained a search warrant for the defendant's body to have him tested for Chlamydia, and that he met the defendant at Wilkes-Barre General Hospital where the laboratory is that tests for Chlamydia, and that the defendant also tested positive for Chlamydia. Id. at 48-49. He testified that the police also seized the defendant's cell phone at the time of his arrest, and determined that on December 11, 2018, the defendant accessed a porn site called "Suck Stepdad's cock." Id. at 53; Commonwealth Exhibit 17. He also testified that the search of the defendant's cell phone revealed a series of texts between the defendant and his girlfriend Desiree Esposito's then thirteen-year-old daughter, K.E., asking her to try to get S.B. to say that she made this up to get back at him, and to record her, and promising that when this is over, they can go out and get a $450 hoodie. Id. at 63-64; Commonwealth Exhibit 15. He also testified concerning two calls that the defendant made from the

10

Lackawanna County Prison on March 21, 2019 and March 25, 2019, to Desiree and K.E. in which they discussed a plan to get his children to say that they made up the allegations. Id. at 65-67; Commonwealth Exhibit 13 and Exhibit 14. He also testified that contrary to the accusation raised by the defense that he threatened S.B., he did not, and that she never told him that she wanted to take back the allegations against her father. Id. at 71-73.

The defense called four witnesses at trial, all of whom testified concerning the recantations of the allegations that S.B. made during the time that she was living with Desiree Esposito in the fall of 2020. Joseph Cocco testified that he is a private investigator hired by the defendant's attorney, and that in September of 2020, he was told by the defendant's attorney and Desiree Esposito that S.B. wanted to speak with him. Id. at 126. He testified that on September 5, 2020, he interviewed S.B. and she told him that everything that she had previously told investigators was not true, and that he then gave her a piece of paper and had her write this down, and that he and she both signed it, and he retained it. Id. at 128-129; Defense Exhibit 2. Ashley Thomas testified that she works for Luzerne County Children and Youth, and that she first became involved with the case in August of 2020 when S.B. was living with Desiree Esposito, and that one time S.B. told her that she made up the allegations about her father and that her mother coached her. Id. at 142, 148. Kaitlyn Mescer testified that she is Desiree Esposito's best friend, and that when S.B. was living with Ms. Esposito, she had one conversation with S.B. during which S.B. stated that her father did not do this to her and her mother forced her to say that he did. Id. at 153-154. Finally, K.E. testified that when S.B. came to live with them in 2020, for the first couple of weeks S.B. said that the allegations against her father were true, and then afterwards, said that it didn't happen. Id. at 161. She

11

testified that S.B would say this kind of frequently because she said that she wanted to stay with them after this whole thing was done. Id. at 162.

### b. Verdict Not Contrary to the Evidence

A reversal of a verdict on weight of the evidence grounds is not necessary unless it is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Roane, 204 A.3d 998 (Pa. Super. 2019). The weight of the evidence is exclusively for the finder of fact who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. Commonwealth v. Cramer, 195 A.2d 594 (Pa. Super. 2018). The jury also has the responsibility of resolving contradictory testimony and questions of credibility. Id. In addition, the jury is tasked with evaluating all witness statements, including any recantations, and is free to believe all, part or none of the statements. Commonwealth v. Hanible, 836 A.2d 36 (Pa. 2003).

The jury here heard all of the testimony detailed above, including S.B.'s explanation as to why she recanted the allegations when she was living with Desiree Esposito in the fall of 2020. The jury found S.B. to be credible. When S.B. testified in court, under the penalty of perjury, both at the preliminary hearing and at trial, she testified consistently and in detail concerning the six years of sexual assaults by her father that she endured between the ages of seven and twelve. It was the province of the jury to believe S.B., and contrary to the defendant's assertion that the case depended only on her testimony, her testimony was corroborated by the fact that as a twelve-year-old child, she tested positive for Chlamydia, as did her father. Moreover, the defendant's assertion that because the Children's Advocacy Center did not find physical evidence of abuse, the allegations must not be true, is also without merit. The Commonwealth's expert, Cheryl

12

Friedman, explained that she did not expect to see physical evidence of the abuse since time had passed since the last sexual contact and the genital area heals very quickly and without scar tissue. She also testified that a normal examination does not mean there has not been abuse. Thus, the verdict does not shock one's sense of justice and should not be reversed on weight of the evidence grounds.

## 2. Sufficiency of the Evidence

The defendant asserts that the Commonwealth failed to present sufficient evidence to establish every element necessary to convict the defendant of knowing or intending to obstruct a child abuse report or investigation under 18 Pa.C.S.A. § 4958(a)(1). Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission of the crime by the accused, beyond a reasonable doubt. Commonwealth v. Johnson, 910 A.2d 60 (Pa. Super. 2006), app. denied, 923 A.2d 473 (Pa. 2007); Commonwealth v. Walls, 144 A.3d 926 (Pa. Super. 2016), app. denied, 167 A.3d 698 (Pa. 2017). When reviewing a sufficiency claim, the court must view the evidence in the light most favorable to the Commonwealth, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Id. at 64. A sufficiency argument that is founded upon disagreement with the credibility determinations made by the fact finder, or discrepancies in the accounts of the witnesses, does not warrant relief, for it is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part or none of the evidence introduced at trial. Id.

A defendant is guilty of intimidation, retaliation or obstruction in child abuse cases if he intends or has knowledge that his conduct toward a reporter, victim or witness

13

"will obstruct, impede, impair, prevent or interfere with the making of a child abuse report or the conducting of an investigation into suspected child abuse under 23 Pa.C.S. Ch. 63 (relating to child protective services) or prosecuting a child abuse case." 18 Pa.C.S.A. § 4958(a)(1). Whether there is a sufficient indicia of such conduct is to be determined by the fact finder and assessed under the totality of the circumstances, cognizant that proof of manifest threats is not required. Commonwealth v. Doughty, 126 A.3d 951 (Pa. 2015) (interpreting witness intimidation under 18 Pa.C.S.A. § 4952).

Here, the Commonwealth introduced into evidence a series of texts between the defendant and his girlfriend Desiree Esposito's then thirteen-year-old daughter, K.E., on February 6, 2019, and on March 8, 2019, in which the defendant asked her to try to get S.B. to say that she made up the allegations to get back at him, and to record her, and promising that when this is over, they can go out and get a $450 hoodie. Transcript of July 17, 2021 Jury Trial at 63-64; Commonwealth Exhibit 15. The Commonwealth also introduced into evidence two phone calls that the defendant made from the Lackawanna County Prison on March 21, 2019 and March 25, 2019, to Desiree and K.E., in which they discuss a plan to get his children to say that they made up the allegations. Id. at 65-67; Commonwealth Exhibit 13 and Exhibit 14. This evidence established that the defendant reached out to a thirteen-year-old girl, who viewed him as a father figure, and who was a friend of his daughter, and promised her a $450 hoodie if she would try to get his daughter to say that she made up the allegations. Notably, it was when S.B. was living with Desiree and K.E. in the fall of 2020 that she recanted the allegations against her father for a time. He also encouraged K.E. to confront his son, G.V., at school to try to get him to say that he made up the allegations, which in fact, she did. Transcript

14

of July 17, 2021 Jury Trial at 164. The defendant manipulated a thirteen-year-old child who viewed him as a father figure into confronting his children and asking them to change their stories. Thus, under a totality of the circumstances, the evidence was sufficient to prove that the defendant knowingly attempted to obstruct, impede, impair, prevent or interfere with the investigation and prosecution of this case.

### 3. Commonwealth's Experts

The defendant asserts that the court erred in accepting Cheryl Friedman as an expert witness. He asserts that she did not issue a report drawing her conclusions "within a reasonable degree of medical certainty," and asserts that the court accepted her as an expert without granting defense counsel an opportunity to question her about her expertise or challenge her credentials. He also asserts that the trial court erred in allowing her to testify in the area of sexually transmitted diseases when it was outside the scope of her expertise, and also to testify about the results of the test for Chlamydia that she performed on the victim, since she could not show the chain of custody for the lab samples.

The defendant asserts that the court also erred in accepting Janine Fortney as an expert witness. He asserts that she also failed to issue her opinion "within a reasonable degree of certainty," and that while she was offered as an expert in delayed reporting, the court allowed her to testify on other areas not contained in her report, including grooming.

Expert testimony is admissible if a witness who is qualified by knowledge, skill, experience, training, or education offers scientific, technical or other specialized knowledge beyond that possessed by the average lay person that will help the jury to

15

understand the evidence or determine a fact at issue. Pa.R.E. 702. When a qualified expert testifies, the weight of his testimony is for the trier of fact to determine. Pa.R.E. 702 cmt. Even where an expert's testimony arguably goes beyond the scope of his or her report, the defendant still bears the burden of proving that he suffered prejudice from the admission of the testimony. Commonwealth v. Poplawski, 130 A.3d 697 (Pa. 2015). Furthermore, while an expert must base the substance of her opinion on a reasonable degree of certainty instead of on mere speculation, she need not use the magic legal words that her opinion is to a "reasonable degree of medical certainty." Commonwealth v. Fitzpatrick, __ A.3d __ (Pa. Super. 2024). Finally, expert testimony in sexual abuse cases is governed by 42 Pa.C.S.A. § 5920, which provides that an expert witness may be qualified by the court if the witness has specialized knowledge related to sexual violence that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

The defendant's assertions that this court erred in qualifying Ms. Friedman and Ms. Fortney as expert witnesses because their reports did not include the magic words "reasonable degree of medical certainty" are without merit. Both experts based their opinions on the specialized training and knowledge that they have concerning sexual abuse, and did not base their opinions on speculation.

Moreover, the defendant's assertion that the court did not grant defense counsel the opportunity to question Ms. Friedman about her expertise or challenge her credentials is simply not true. When the Commonwealth began to qualify Ms. Friedman as an expert, defense counsel asked for a sidebar. Transcript of June 16, 2021 Jury Trial at 121.

16

The parties had an argument at sidebar about Ms. Friedman's report, and at the conclusion of the argument, the court stated that it would consider her report an expert report and that the defendant can cross-examine her on it, and that it was going to admit her as an expert. Id. at 122. When the parties went back on the record before the jury, the Commonwealth continued to ask Ms. Friedman questions in order to qualify her as an expert, and at the conclusion of the questions, the court asked defense counsel if he wished to voir dire her on her qualifications. Id. at 123-124. Defense counsel declined to do so. Id. The court then qualified her as an expert witness. Id.

It was also not in error for the court to allow the Commonwealth to question Ms. Friedman about how sexually transmitted diseases are transmitted. She is a family nurse practitioner who is a certified Sexual Assault Nurse Examiner, who has hours of clinical experience in the field of sexual assaults and who works at the Children's Advocacy Center examining children who are victims of sexual abuse. Id. at 116-121. She is clearly qualified by knowledge, skill, experience, training, and education to testify about how sexually transmitted diseases are transmitted.

It was also not in error for Ms. Friedman to testify concerning the results of the test for Chlamydia that she performed on S.B. Defense counsel objected to the evidence since Ms. Friedman testified that after she swabbed S.B.'s vaginal canal for sexually transmitted diseases, she followed professional standards and protocols in preparing the swabs and submitting them to the laboratory at Moses Taylor Hospital for testing. Id. at 138-139. Defense counsel objected and insisted that because Ms. Friedman could not testify as to the chain of custody of these swabs after they left her office, she could not testify as to the results of the Chlamydia test. Id. at 145. However, the Commonwealth

17

informed the court that subsequent witnesses would testify as to the steps taken in obtaining the test results for these swabs, and the court overruled the objection. Id. at 145-148. In fact, the Commonwealth did offer the testimony of Dr. Michael Yoder, the laboratory director at Moses Taylor Hospital, as well as Dr. Navid Ahmad, the Chairman and Director of Pathology at Wilkes-Barre General Hospital, concerning how S.B.'s test for Chlamydia was processed and how the results of the test were generated. Id. at 162-183; 193-206. It was thus not in error for Ms. Friedman to testify as to the results of the test that she ordered.

Finally, it was not in error for the court to allow Janine Fortney to testify concerning how grooming generally occurs in child sex abuse cases. Ms. Fortney testified that based on her training and experience she has come to understand the process by which children respond to sexual abuse, and is familiar with delayed disclosure in sexual assault cases and the grooming techniques used to allow for the sexual assault of children. Id. at 207-213. The Commonwealth moved for her admission as an expert in the dynamics of sexual abuse and victim responses to sexual abuse, and defense counsel objected. Id. at 213-214. The court overruled the objection and gave defense counsel the opportunity to voir dire, but he declined, and the court accepted Ms. Fortney as an expert in the dynamics of sexual abuse and victim responses to sexual abuse. Id. at 214. The Commonwealth then introduced a report generated by Ms. Fortney, and defense counsel objected because she never treated the individuals involved in this case, and the court overruled the objection and admitted her report into evidence. Id. at 215-216; Commonwealth Exhibit 12. The report generally discusses delayed disclosure, grooming processes and their relationships, and misconceptions as to the potential behaviors or

18

reactions of the victims of child sexual abuse. Id. at 217. After Ms. Fortney testified at length about these subjects, defense counsel objected that she was testifying about grooming which is outside of the scope of her report. Id. at 223. The court disagreed because grooming is in the report, and she testified to things she relied upon to come up with her opinion, and the defendant could explore this more specifically on cross-examination. Id. at 223-225. Because it was entirely proper for an expert witness to testify about issues for which she has been accepted as an expert witness, and which are contained in her expert report, the court properly allowed Ms. Fortney to testify concerning grooming in child abuse cases. See Commonwealth v. Smith, 206 A.3d 551 (Pa. Super. 2019) (Ms. Fortney properly accepted under 42 Pa.C.S.A. § 5920 to testify generally about the dynamics of sexual violence and victim responses to sexual violence).

### 4. Sentencing

The defendant asserts that the aggregate sentence imposed is manifestly excessive and contrary to the norms of the sentencing process since virtually all of the sentences were imposed consecutively and the court failed to consider the rehabilitative needs of the defendant. The defendant also asserts that the sentence is unduly harsh and excessive considering the nature of the crimes since it was on the high end of the guideline range considering the defendant's background and history and the court imposed what amounts to a life sentence. Finally, the defendant asserts that the court imposed an illegal sentence when it failed to merge the sentences for rape of a child and indecent assault of a person less than 13 years of age since the convictions were predicated upon the same acts of sexual intercourse.

19

### a. Sentencing Hearing

At the sentencing hearing in this case, the parties stipulated to the finding by the Sexual Offenders Assessment Board that the defendant met the criteria to be classified as a sexually violent predator. Transcript of October 21, 2021 Sentencing at 4. The court stated that it had to give the defendant the appropriate sentence, not only based on the facts at trial, but also the impact that his actions had upon his children, upon the community and the need to protect the public. Id. at 20. The court stated that the defendant's actions were totally reprehensible and that he scarred his son and daughter not only when he committed these heinous acts, but scarred them forever, as well as the family matters that they have had to deal with in the aftermath of his destruction. Id. The court stated that he was the father, and they were both young in age, and the abuse was prolonged over a number of years, robbing them of their childhood. Id. The court noted that he even gave his daughter a sexually transmitted disease. Id. The court found this to be one of the worst cases that it had ever been involved with in 30-plus years in the criminal justice system, and stated that words cannot describe the terrible acts that the defendant committed. Id. The court then imposed sentences on each of the 35 counts for which the defendant was found guilty.

In case no. 19-CR-440, the court imposed the following sentence: twenty to forty years, followed by three years of special probation on each of the four counts of rape of a child; one to ten years, followed by three years of special probation on each of the four counts of statutory sexual assault of a child under the age of 16 by a person 11 or more years older; seven to twenty years, followed by three years of special probation on each of the six counts of involuntary deviate sexual intercourse with a child; one to five years

followed by three years of special probation on each of the four counts of incest of a minor under age 13; one to five years on the count of corruption of minors; and three years of special probation on each of the six counts of indecent assault of a victim less than 13 years of age. Id. at 21-30. Each of the sentences was ordered to run consecutive to the others. Id. The court also ordered the defendant to complete sexual offenders counseling and abide by all recommendations. Id. The court did merge the four counts of aggravated indecent assault of a child with the four counts of rape of a child for sentencing purposes. Id. at 26.

In case no. 19-CR-1055, the court imposed a sentence of two years of special probation on the count of endangering the welfare of a child, consecutive to the sentences in 19-CR-440. Id. at 30. In case no. 19-CR-1772, the court imposed a sentence of one to five years on the count of knowledge or intent to obstruct a child abuse investigation, and one to five years on each of the two counts of corruption of minors, consecutive to all other sentences. Id. at 30-31. Finally, in case no. 19-CR-1774, the court imposed a sentence of one to five years on the count of knowledge or intent to obstruct a child abuse investigation, and one to five years on the count of corruption of minors, consecutive to the other sentences. Id. at 31. The aggregate sentence was thus 136 to 370 years plus 74 years of special probation. Id. at 32.

The court stated that even though the sentence may seem impractical in terms of the amount of years the defendant is to be incarcerated, the court believed that his actions were so heinous that he should spend the rest of his life in jail so that he can never do this to another child ever again. Id. The court also noted that each of the sentences were in the high end of the standard guideline range. Id.

21

### b. Legality of Sentence

The defendant asserts that the aggregate sentence imposed is manifestly excessive, unduly harsh and contrary to the norms of the sentencing process since the court failed to consider the rehabilitative needs of the defendant and the defendant's background and history. The defendant also asserts that the court imposed virtually all of the sentences consecutively which was harsh considering the nature of the crimes. And he asserts that while all of the sentences were within the guideline range, application of the guidelines was unreasonable here since it resulted in what amounts to a life sentence.

A claim that the sentence imposed by the trial court was excessive is a challenge to the discretionary aspects of the sentence. Commonwealth v. Seagraves, 103 A.3d 839 (Pa. Super. 2014); Commonwealth v. Marts, 889 A.2d 608 (Pa. Super. 2005). In order to challenge a discretionary aspect of sentencing, the defendant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. Id. at 612. An allegation that the sentencing court "failed to consider" or "did not adequately consider" various factors is really an assertion that the trial court's judgment is flawed, and is not grounds to vacate a sentence. Commonwealth v. Griffin, 804 A.2d 1 (Pa. Super. 2002), cert. denied, 125 S.Ct. 2984 (2005). When a defendant does not argue that the sentencing court received incorrect information, but simply alleges that the lower court inappropriately applied the information, this is effectively a request for the Superior Court to substitute its judgment for that of the lower court. Id. at 9. And, where a trial court is informed by a presentence investigation report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and its discretion should

22

not be disturbed. Commonwealth v. Conklin, 275 A.3d 1087 (Pa. Super. 2022); Commonwealth v. Ventura, 975 A.2d 1128 (Pa. Super. 2009).

Furthermore, a sentencing court has great discretion in imposing sentences concurrently or consecutively. Commonwealth v. Austin, 66 A.3d 798 (Pa. Super. 2013). The key to determining whether an aggregate sentence is excessive is whether it appears to be excessive, on its face, in light of the criminal conduct at issue in the case. Commonwealth v. Mastromarino, 2 A.3d 581 (Pa. Super. 2010). Persons convicted of multiple offenses are not entitled to a "volume discount," and particularly in cases of systematic sexual abuse of a child over the course of years, the courts have recognized that such heinous crimes warrant an aggregate sentence that may amount to a life sentence. Commonwealth v. Prisk, 13 A.3d 586 (Pa. Super. 2011) (aggregate sentence of 633 to 1500 years was not excessive where child was assaulted over a period of six years); Commonwealth v. Velez-Rivera, 297 A.3d 748 (Pa. Super. 2023) (non-precedential) (upholding aggregate sentence of 128 to 262 years where father assaulted two minor daughters on multiple occasions over an extended period of time); Commonwealth v. Sauter, 2022 WL 320884 (Pa. Super. 2022) (non-precedential) (upholding aggregate sentence of 90 to 180 years where defendant sexually assaulted a young girl who viewed him as a father figure on multiple occasions from age 12 to 14).

Contrary to the defendant's assertions, this court did consider the relevant sentencing factors in imposing sentence in this case. The defendant does not assert that the court considered incorrect information, but rather that he is unhappy with the conclusions this court reached in considering the information, and that the court should have given more weight to his rehabilitative needs. The court noted that the defendant

23

was the father of these young children and scarred them for life, that he gave his own daughter a sexually transmitted disease, and that his actions were some of the worst the court had seen in its 30-plus years in the criminal justice system. The court also noted that it needed to protect the public so that the defendant can never do this to another child ever again. The court considered all required factors here, including all of the information in the defendant's presentence investigation report which included his background and history, and simply did not accord them the weight the defendant believed it should have. In consideration of his rehabilitative needs, the court did order the defendant to attend sexual offenders counseling and abide by all recommendations.

Moreover, it was within this court's discretion to impose the sentences consecutively in light of the criminal conduct at issue in this case. It was precisely the "nature of the crimes" that warranted such a lengthy sentence here, rather than requiring a lesser sentence as the defendant asserts. The defendant sexually assaulted his daughter on a regular basis over the course of six years. He is not entitled to a volume discount for these repeated heinous actions. He then tried to corrupt his minor son by showing him pornographic videos involving brother/sister sex, and tried to get another minor to influence his children into recanting the allegations. In light of the serious criminal conduct committed by the defendant at different times and against different minor victims over a period of six years, consecutive sentences were appropriate here. This court did exercise some leniency in imposing probationary sentences for the six counts of indecent assault of a victim less than 13 years of age. Because the court considered all required factors here, sentenced the defendant within the standard range of the sentencing guidelines, and exercised its discretion to impose the sentences consecutively and to issue

24

probationary sentences for some of the counts, the defendant has not demonstrated that the sentence is not appropriate under the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

### c. Merger

Finally, the defendant asserts that the court erred in failing to merge four of the six counts of indecent assault of a victim less than 13 years of age with the four counts of rape of a child. He asserts that since the indecent assault convictions were based upon oral and sexual intercourse with the victim, and the rape of the child convictions were based upon sexual intercourse with the victim, the convictions were predicated upon the same acts of forcible intercourse and should have merged.

Crimes do not merge for sentencing purposes unless the crimes arise from a single criminal act, and all of the statutory elements of one offense are included in the statutory elements of the other. 42 Pa.C.S.A. § 9765. In determining whether two or more convictions arose from a single criminal act, the court must examine the charging documents, including the criminal information, criminal complaint and affidavit of probable cause. Commonwealth v. Dove, 301 A.3d 427 (Pa. Super. 2023) (upholding sentence of 86 to 177 years' incarceration after defendant sexually assaulted minor stepdaughters for years). Where these documents describe facts in such a way as to distinguish the specific conduct underlying the offense, then the offenses are the result of multiple criminal acts for the purpose of avoiding merger. Id. Where a victim testifies that he was sexually assaulted on multiple occasions, the defendant has committed separate criminal acts that warrant separate sentences for each of those acts. Commonwealth v. Brantley, 2024 WL 457187 (Pa. Super. 2024) (non-precedential);

25

Commonwealth v. Wenzler, 2019 WL 517721 (Pa. Super. 2019) (non-precedential).

A person commits rape of a child "when the person engages in sexual intercourse with a complainant who is less than 13 years of age." 18 Pa.C.S.A. § 3121(c). Sexual intercourse is defined as: "in addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight." 18 Pa.C.S.A. § 3101. A person commits indecent assault of a victim less than 13 years of age when "the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and the complainant is less than 13 years of age." 18 Pa.C.S.A. § 3126(a)(7).

Here, this court did merge the four counts of aggravated indecent assault of a child with the four counts of rape of the child. In the Information, both of these crimes were described as the defendant engaging in sexual intercourse with S.B. when she was 9, 10, 11 and 12 years of age. However, the court did not merge the six counts of indecent assault of a victim less than 13 years of age with the four counts of rape of a child. The Information described the indecent assault crimes as the defendant engaging in oral and sexual intercourse with S.B. when she was 7, 8, 9, 10, 11 and 12 years of age. The Criminal Complaint describes the basis for the indecent assault charges as the defendant molesting the victim starting when she was seven, until she was twelve, about once a month for 57 months. The Affidavit of Probable Cause states that S.B. reported that she had been sexually assaulted by her father from age seven, and that while they were riding in the car, he would expose his penis and direct her to touch his penis with

26

her hand or mouth and that this happened on multiple occasions, and that in their home, in his bedroom, he directed her to put her mouth on his penis and he would ejaculate inside her mouth. It also states that S.B. reported that at other times the defendant directed her to put her mouth on his penis and then would instruct her to take her pants and underwear off and sit on top of him on his bed and he would insert his penis in her vagina. It states that she reports that these assaults occurred about once a month.

Thus, in examining all of the charging documents, there were certainly enough separate criminal acts of indecent contact between the defendant and S.B. to support the six counts of indecent assault of a victim less than 13 years of age, separate from the acts of sexual intercourse that supported the four counts of rape of a child. In fact, the Criminal Complaint originally charged the defendant with 57 counts of indecent assault, because there were so many separate criminal acts of indecent contact. And at trial, S.B. testified that when the defendant began to have sexual intercourse with her when she was nine, he did not stop forcing her to engage in oral sex and other indecent contact. The Commonwealth could have charged the defendant with more than four counts of rape of a child (it charged only one for each year that the sexual intercourse took place), and more than six counts of indecent assault of a victim less than 13 years of age (it charged only one for each year that indecent contact took place). S.B. testified that the defendant sexually assaulted her at least monthly for six years. Because there were clearly enough separate criminal acts to support these charges, merger was not required here.

27

**BY THE COURT:**

_____, J.

cc: Terrence McDonald, Esq.
    Lisa Swift, Esq.

28